*In re* MAST, BUFORD & BURWELL Co., *Insolvent.*

Argued July 2, 1894.   Reversed July 20, 1894.

No. 8746.

Removal of an Assignee of an insolvent.

Where a trusted and confidential employé of an insolvent corporation was selected for its assignee, by its president, who held a majority of its stock, had obtained illegal preferences to indemnify him against his indorsements for the corporation, and who guarantied the assignee a certain compensation for a specified time for his services as assignee, and such assignee, after accepting and entering upon the trust, made an agreement with said president and other preferred creditors, who were not residents of this state, to hold and collect for them, as their trustee, securities in his hands as assignee which had been received by the insolvent as collateral to other securities delivered by it to such creditors as an illegal preference, retaining such collateral in its hands, and the assignee, to assist him in the performance of his trust as assignee, employed the former attorney of the insolvent, *held*, under all the circumstances of this case, it was error in the court below to refuse to remove the assignee on the application of a minority in number or amount of the creditors.

Appeal by G. Weaver Loper and sixteen others, creditors of Mast, Buford & Burwell Company, an insolvent corporation, from an order of the District Court of Ramsey County, *Hascal R. Brill*, J., made January 20, 1894, refusing to remove Victor Robinson from his trust as its assignee.

On September 18, 1893, Mast, Buford & Burwell Company made an assignment of all its property under Laws 1881, ch. 148, as amended, to Victor Robinson in trust for its creditors. He accepted the trust upon the written agreement of P. P. Mast & Co., a corporation of Springfield, Ohio, that it would see that he received $3,000 a year for his services as such assignee. He had been "credit-man" and head bookkeeper of the insolvent corporation and W. D. Cornish had been its attorney. The assignee after assuming his duties employed Mr. Cornish as his attorney. G. Weaver Loper and sixteen other creditors, less than a majority in number and amount, petitioned the court December 20, 1893, on notice and affidavits to remove the

assignee for cause and appoint a disinterested and competent man in his stead. This was opposed by the principal creditors who held collateral security for their claims, and by the assignee and his attorney. The petitioners represented among other things that Mast, Buford & Burwell Company was doing a wholesale agricultural implement business at St. Paul and sold farm machinery to country retail dealers, and often took the retailer dealer's note, and received from him farmers' notes as security for its payment. The petitioners represented that a large amount of retail dealers' notes thus secured by farmers' notes had been transferred to P. P. Mast & Co. and other creditors shortly before the assignment whereby those creditors obtained an unlawful preference, and that the assignee and his attorney, knowing the facts, failed to institute proceedings to recover the notes and property so transferred. After hearing and considering voluminous affidavits and schedules of assets and liabilities presented by all the parties in interest, the trial court denied the petition and the petitioners appeal.

*Flandrau, Squires & Cutcheon, C. D. & Thos. D. O'Brien, Bunn & Hadley, Lewis & Hallam,* for appellants.

Lord Mansfield in *Rex* v. *Wilkes*, 4 Burr. 2539, said: "Discretion when applied to a court of justice means sound discretion guided by law. It must be governed by rule, not by humour; it must not be arbitrary, vague and fanciful, but legal and regular." A case is presented in the pending appeal which has not been guided by law. A case, it seems to us, almost without parallel in the boldness with which the rights of minority creditors have been trampled upon.

There is no dispute about the facts here, and the questions involved can be discussed almost as bare propositions of law. It is conceded, or at any rate proved:

1. That the assignee has an agreement from the largest creditor guaranteeing him a salary, and that such agreement was not sanctioned by the court nor approved by the creditors.

2. That the assignee in his individual capacity has for a moneyed consideration bound himself as trustee to collect certain securities charged to be preferences and to turn over the proceeds to the persons from whom he received the securities.

3. That more than six months have passed since a formal demand was made upon the assignee that he bring suit to set aside the preferences, and he has done nothing whatever to establish the rights of the estate, or even to question the preferences.

The court below considered that the foregoing did not constitute grounds for removal because, according to the opinion of that court:

1. There was no agreement that the creditor guaranteeing the salary should receive any benefit by reason thereof.

2. There was no legal reason why the assignee could not sue himself as trustee to recover from himself the securities alleged to be preferences.

3. The assignee was justified in waiting until the preferred creditors came within the jurisdiction before taking steps to question the preferences.

A person in a fiduciary trust is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which can have a tendency to interfere with his duties in discharging it. Burrill Assignments, §§ 392, 462; *Clark* v. *Stanton*, 24 Minn. 232.

The assignee here is actually in the pay of the largest creditor; he has been informed that large preferences have been made to that creditor, and has been formally requested to bring suit to set aside those preferences; six months have elapsed since that request, but nothing has been done; and yet the court below sees no impropriety in his actions, because of the eminent respectability of the assignee and of his counsel. *First Nat. Bank* v. *Barnum W. & I. Works*, 60 Mich. 487; *Benneson* v. *Bill*, 62 Ill. 408.

There is no branch of the administration of the law which is so full of frauds and deception as the management of insolvent estates. The fraud that crept into the United States courts caused the repeal of the National Bankruptcy Act, and the fear that enough safeguards cannot be thrown around such proceedings in the future has, more than any other one cause, prevented the enactment of another. If our Insolvency Act is not to become a farce, this court must condemn such acts as have been brought to light in this proceeding, and remove an assignee who is guilty of them, whoever he may be.

*W. D. Cornish, Young & Lightner, Stevens, O'Brien, Cole & Albrecht, Davis, Kellogg & Severance, John D. O'Brien, Warner, Richardson & Lawrence,* for respondents.

This is an appeal from an order made after full hearing of parties and upon voluminous evidence submitted to the court. All creditors were entitled to be heard, and a large number were heard and filed their objections to the removal of the assignee. The creditors numbered about two hundred and fifty. Only thirty one petitioned for the removal. Of these, eleven have claims of less than $100. The creditors opposing the application for removal are between forty and fifty in number and represent $341,245.94 out of $453,156.50 of indebtedness.

The petitioning creditors represent an indebtedness of $85,802.11. Of this amount $42,191.21 is among the scheduled secured indebtedness, and of the remainder $15,983.64 has obtained security by attachment and garnishment in other jurisdictions, leaving on appellants' own showing but $27,627.26 of unsecured indebtedness in any manner identified with the appellants' application for removal of the assignee. The record discloses beyond question that this application originated and is promoted by Burwell and one or two of his personal friends.

The appellants are candid enough to admit that the honesty and integrity of the assignee and his attorney are unquestioned, and their competency is also admitted. There is a clear distinction between those acts of an assignee or trustee which the court will inspect with the strictest scrutiny and those which legally disqualify an assignee or trustee. In the former case the facts are capable of explanation. In the latter case no explanation will remove the legal disqualification. In the present case the facts complained of are most fully and satisfactorily explained and shown to be consistent with the fair and impartial administration of his trust by the assignee and his attorney.

CANTY, J. This is an appeal from an order denying an application to remove the assignee of an insolvent corporation. The corporation is Mast, Buford & Burwell Company. It was organized under the laws of this state, its principal office was in St. Paul, and

it was engaged in the business of buying, selling, and handling, on commission, agricultural implements.

P. P. Mast, of Springfield, Ohio, was, since 1885 or 1886, its president, and, at the time of the assignment, owned $30,000 of its stock, out of a total of $55,000 issued.

J. H. Burwell was the vice president, treasurer, and general manager of the corporation from 1884 until two or three weeks before the time of the assignment, and during that time, according to the record, embezzled over $60,000 of the funds of the corporation. During this time the concern kept running in debt, until, at the time of the assignment, it owed P. P. Mast & Co. over $111,000, and Mast, Foos & Co. $7,000. These were both Ohio corporations, of which P. P. Mast was president and one of the principal stockholders. It also owed various banks and other concerns large amounts, on $70,-000 of which P. P. Mast was indorser. In August, 1893, Mast sent an agent, one Kirkpatrick, to St. Paul, to investigate the affairs of the concern. He arrived on August 14th. Mast followed him, and arrived August 20th. As a result of the investigation, the defalcations of Burwell were discovered, which he acknowledged on August 23d, and on August 26th resigned his position as treasurer and general manager, and one Hurd was elected in his stead. The assignment for the benefit of creditors was made on September 18, 1893, to Victor Robertson, who had been in the employ of the insolvent corporation since January 1, 1892, as "credit man," and since April 1, 1892, had general charge of the books of the concern, the work being done by bookkeepers under his supervision. After the arrival of Kirkpatrick, and before the assignment, about $30,000 of commercial paper held by the corporation was turned over to or taken by Mast to secure or indemnify him on his said indorsements, and at least a part of it was turned over by him to the concerns holding this indorsed paper. In May previous, Mast had also received $10,000 more of this paper to secure him on his said indorsements, and had disposed of it in the same way.

Robertson had been receiving from the insolvent corporation a salary of $3,000 a year, and, at the time of the assignment to him, P. P. Mast, as president of the P. P. Mast Company, made a written agreement guarantying Robertson, for his services for one year as

assignee, the sum of $3,000, and Robertson accepted the trust and entered on his duties.

Seven creditors of the insolvent, being four banks, two manufacturers, and P. P. Mast, held severally a large amount, in the aggregate, of "dealers' paper," being notes given to the insolvent by its customers, and either discounted by the insolvent to these creditors or delivered to them as collateral security for the notes of the insolvent to the creditor. Much of this "dealers' paper" was also secured by other collateral, being the notes and mortgages of the farmers to the dealers, who delivered this secondary collateral to the insolvent, as collateral security for the dealers' notes to the insolvent. But while the dealers' notes were so delivered to these seven creditors, the secondary collateral was retained by the insolvent, and it had in its hands, at the time of the assignment, $64,951 of this secondary collateral, securing such dealers' notes, which notes had been so delivered to these creditors. In many instances, the insolvent had received several notes of the same dealer, all secured by a lump quantity of this secondary collateral, and delivered one of these notes to one, and another to another, of these seven creditors, retaining the secondary collateral itself. It seems that there was $39,906 of this secondary collateral in this condition, and much confusion and many complications presented themselves to these creditors in attempting to take and divide among themselves, or collect, this secondary collateral. Thereupon, on October 3, 1893, the agreement, Exhibit I, was made by and between these seven creditors and Victor Robertson, in his individual capacity, providing that they should deposit with him the primary collateral, and notes secured by it, and that he should hold and collect all of the same, and also this $39,906 of secondary collateral, and pay all of the proceeds to the seven creditors, according to their several interests; that, in case of disputes, they shall adjust the same among themselves, or submit them to Robertson for decision, and, if no adjustment could be made, to withdraw the items in controversy from the operation of the agreement.

It was also provided that Robertson should receive two per cent. on each collection, and also his necessary disbursements. Robertson entered upon the performance of this trust, and, at the time of the application to remove him, had so collected $7,000, which he still held.

The application to remove him was made by a minority in number and amount of the creditors, and was made and opposed on affidavits showing the foregoing and other facts, and no objection was made to its being heard on affidavits. The court denied the application, and the petitioning creditors appeal.

In answer to the charges made by the parties on each side of this controversy, it may be stated that the hand of Burwell is quite visible in the proceedings for the removal of this assignee, and the hand of Mast is quite visible on the other side, and most of the larger creditors seem to have ranged themselves as partisans of either Mast or Burwell. It is charged by the creditors petitioning for removal that Mast gave, as aforesaid, to the creditors holding his indorsements, just before the assignment, a large amount of collateral, which gave them and him an unlawful preference, and that they are opposing this application because an assignee not appointed in their interest might compel them to disgorge. On the other hand, it is charged by the friends of the assignee that the larger of these petitioning creditors are the friends of Burwell, who, just before the assignment, gave them information of the existence, location, and description of considerable property of the insolvent in other states, which enabled them to attach it, and that they are now striving to give Burwell, either directly or indirectly, the control and management of the assigned estate. It seems to us that the court would make a very serious mistake in lending itself to Burwell's schemes, or in placing this estate in the hands of any one who could be at all influenced or used by the man who seems to have done so much to wreck it. But that is no reason why the present assignee should be retained, if he is also under improper influence; but the court should try to find an assignee who will do his whole duty, and perform his trust impartially.

We are of the opinion that the court below erred in denying this application to remove the assignee. The court below seems to have assumed that the honesty, respectability, and business standing of the assignee and his legal adviser are a complete defense to this proceeding. Where the rights of others are involved, there are many positions in which an honest man might be placed in which he is not competent to act.

The following are the principal reasons which, in our opinion, conspire together and show conclusively that the assignee is not a proper person to manage this estate:

(1) He was a trusted and confidential employé of the insolvent in this same business before the assignment.

(2) His attorney was the attorney for the insolvent before the assignment.

(3) The president of the insolvent guarantied the amount of the compensation that the assignee should receive.

(4) The assignee accepted the trust created by Exhibit 1.

(5) The president of the insolvent corporation controlled the appointment of an assignee who he must have known would become his adversary in subsequent important litigation.     There are other circumstances, but the case will be discussed principally under these main points.

1. The assignee was the "credit man," and had supervision of the bookkeepers of the insolvent, and it is strongly urged, as a reason why he should be retained, that he is thoroughly familiar with all the details of the insolvent's business.     While this may be a strong reason for his retention, it may be wholly outweighed by other considerations.     He states in his affidavit that he took no part in the giving of the preference to Mast, which must, on this appeal, be taken to be true.     But it appears, by all the evidence, that he was a much trusted and confidential employé.     He seems to have made no objection to the giving of these preferences on the one hand, or the defalcations of Burwell on the other, and must have known of both.     Then, if he is honest and faithful, he must necessarily have regarded the officers of this corporation, and not the corporation itself, as his master.     A faithful employé is always averse to using, against his old master, confidential communications received by him while in the employ of that master, and to so using secrets not imparted in confidence, but learned incidentally in his connection with the master's business; and such master would hardly put him in a position where it became his duty so to use such secrets, if such master believed he would regard it as a duty.     Neither can such ex-employé be expected to go groping around in the dark to learn adversely what he already knows confidentially.     Such attempt to learn by fair adverse means what he already knows would be the mere pretense of a play, and

not an act in real life.    It is human nature that a person in such a position would be false to his former trust, or false to his present trust.

2. The attorney for the assignee was the attorney for the insolvent before the assignment.    He states in his affidavit that, prior to the assignment, "deponent had been in consultation with the secretary of said company with reference to certain claims of creditors who were supposed to be preparing to attack the company through the courts;" that he afterwards advised the calling of a meeting to make the assignment, drew the deed, advised the making of the guaranty by Mast to the assignee, and drew the trust agreement, Exhibit I. Hurd, who succeeded Burwell as manager, in his affidavit states "that deponent was then advised by the attorney of the company that, if it became necessary to make an assignment, it would be first necessary to have a meeting of the board of directors of the company to authorize the same."

In an affidavit used in rebuttal, Burwell states that this attorney was the attorney and counselor of himself and of the insolvent, and advised and conducted all the legal proceedings and business matters of the company requiring legal advice, excepting the small collections which had to be sued outside of St. Paul, and that upon the arrival of Mast at St. Paul, in August, 1893, he placed in the hands of this attorney, for legal counsel and advice, the business affairs of himself, P. P. Mast & Co., and Mast, Foos & Co., relating to the matter of said Mast, Buford & Burwell Company.    The affidavit proceeds:

"Affiant further says that when the deeds to said Mast, from said insolvent, of the real estate in North Dakota and South Dakota, belonging to said insolvent, had been drawn, that he, said affiant, consulted with said attorney as to whether he, said affiant, as the vice president of said insolvent, should execute the said deeds, and that he was told by said attorney that he, said attorney, did not see how, under the circumstances, he, said affiant, could do otherwise than sign and execute the deeds, and that thereafter, and upon such advice, said affiant did sign and execute said deeds; that all of said deeds to said Mast of said property, including said deed of the property in Grand Forks, in the state of North Dakota, were executed in the office of said attorney, and the acknowledgments thereof taken

v.58 m.—21

before a notary public employed in said office, as by a certified copy of said deed to said Grand Forks property, hereto attached, and marked 'Exhibit A,' will more fully appear."

In answer to this the attorney makes an affidavit as follows: "That while engaged in the practice of law in St. Paul, during the past ten years, he has been frequently employed by J. H. Burwell and Mast, Buford & Burwell Co., although he has never been retained generally, either by said Burwell or said company; that he was consulted by said company as to certain specific questions during the summer of 1893, and while said Burwell was its general manager, but was never informed as to the condition of the business in general, until about the time that said Burwell resigned as general manager; that on the arrival of P. P. Mast in St. Paul, and about August 21, 1893, said Mast and his attorney, C. C. Kirkpatrick, had a conversation with deponent, as attorney for said Mast, Buford & Burwell Co.; that deponent never saw said Mast again until the day the assignment was made; that deponent has acted solely as attorney for said Mast, Buford and Burwell Company, and for its assignee, and not as attorney for said Mast, or P. P. Mast & Co., or Mast, Foos & Co.; that the deeds referred to in said Burwell's affidavit were not drawn in deponent's office, but that said Burwell did ask deponent if he could execute them as vice president, and whether he should execute them, and that deponent did inform said Burwell that he could execute such deeds, and that, if he was requested to execute the same by the others in authority, deponent did not see how he could refuse; that said deeds were brought to deponent's office by said Burwell and Kirkpatrick, but that deponent was not then consulted in regard thereto, but, as deponent is informed, they were executed there."

While we believe this attorney to be an honorable man, yet it seems to us that, under the circumstances, the assignee should not have employed him, and he should not have consented to act for the assignee.

3. While the agreement guarantying the compensation of the assignee might be sufficiently explained if it stood alone, it does not stand alone, but must be considered with too many other things which require explanation.

4. When Exhibit I was made, Robertson reserved no right to retain the proceeds of the paper claimed to have been delivered to Mast

as an illegal preference.   On the contrary, by his agreement, he turned over to himself, as trustee, this secondary collateral or farmers' paper in his hands as assignee, and bound himself, as such trustee, to deliver a part of the proceeds thereof to parties who are beyond the jurisdiction of the courts of this state.

In a communication to one of these seven creditors, just after the assignment, he states: "There is general security, to various groups of dealers' notes in the shape of farmers' paper, aggregating $64,956. * * * This farmers' paper, as collateral to the dealers' notes, is in my hands as assignee, and it is proper that the security should follow the notes which passed out of the possession of Mast, Buford & Burwell Co. prior to the assignment.   Some of this paper is in the hands of banks and attorneys in the country for collection and remittance to Mast, Buford & Burwell Co. at St. Paul.   Some of the paper is in my possession."

It does not seem to have occurred to the assignee that it might be an advantage to the insolvent estate to retain in his hands, as assignee, at least the part of this farmers' paper claimed by these non-residents, as a step towards setting aside the preference to Mast, and not embarrass himself by agreeing with these creditors to hold it as trustee for them.

5. In conclusion, we will say that Mast was the owner of a majority of this stock, and it is fair to presume that he chose an assignee of his own selection.   He had just taken, for his indemnity, over $30,-000 of securities, which appears to be an illegal preference.   He had just discovered the defalcations of Burwell, for which he may be liable for neglect of his duty for six or eight years as president.   However honest he may be, he is human, and the temptation to appoint an assignee whom he believed he could control was very great.   For this reason alone, his acts and those of the assignee should be carefully scrutinized.   But there are added to this too many other acts and circumstances which have to be carefully scrutinized.   An attempt has been made to explain all of these matters, and many of the explanations must be taken by an appellate court to be sufficient.   But, from the accumulation of circumstances, matters may reach a point where explanations cease to explain.   As a question of law, we are of the opinion that it is not consistent with sound policy to permit an assignee to retain his trust, who is apparently tied up

to, and involved with, adverse interests as much as this assignee appears to be.    In the discharge of his duty as assignee he should be free from such influence.    He should be ever on the alert to perform his duty, and should know no other duty.    That this assignee is a man of honesty and integrity is not disputed; but he might have to be a man of the greatest firmness and most heroic moral courage to be able to do his whole duty under the circumstances of this case.

The order appealed from should be reversed.    So ordered.

BUCK and COLLINS, JJ., absent.

(Opinion published 59 N. W. 1044.)